I will hear first from Ms. Williams. May it please the Court, Christina Williams on behalf of Appellant LPL Financial, LLC. LPL seeks three types of relief from this Court. First, to reverse the District Court's order to the extent it denied LPL's motion to compel Premier and Associates' claims to arbitration. Second, a stay of all litigation pending arbitration. And third, to maintain this Court's stay of all District Court proceedings pending the outcome of this appeal. Turning to my first point, the District Court erred in denying LPL's motion to compel Premier and Associates' claims to arbitration. The District Court was correct in finding that California law governs because the representative agreement has a California choice of law provision. To be clear, plaintiffs waived the issue by not contesting or challenging that below. The representative agreement that Ms. Cure & LPL signed contains a clear agreement to arbitrate, quote, all disputes related to Cure's association with LPL and her termination from LPL. While it is the general rule that one must be a party to an arbitration agreement to be bound to it, California law recognizes a clear exception for the doctrine of equitable estoppel. Under the equitable estoppel doctrine, and I'll quote to the JSM Tuscany case cited in our briefing, a non-signatory plaintiff can be compelled to arbitrate a claim when the claim is itself based on or inextricably intertwined with the contract containing the arbitration clause. California courts have held that tort claims are not precluded from arbitration agreements if the underlying agreement, quote, embraces the disputed matter. This is particularly true when the plaintiff's signatory and non-signatory are related entities. And here there's evidence in the record that these are related entities. To start with, Ms. Cure is the sole owner and operator of both Premier and Associates. Didn't Associates, I mean, it's got a significant history, correct? Isn't it the accounting firm? Yes. The record shows that Associates is an accounting firm that was formed before LPL and Cure signed the representative agreement. However— So it was doing its thing. It had business activities and et cetera and so forth before Ms. Cure became affiliated with LPL. Yes. The extent of that business history besides the fact that it was formed and it was an accounting business is not clear from the record, but what we do know is we know that solely for the purposes of our LPL business, and Associates shared the same office building. We know that they have mutual employees and what's key there is this is not a 50 or 100 person corporation. It's a very small office, so when you have less than 10 employees and you have a few overlap that's more significant. We also know that Premier and Associates claim to have lost mutual clients from the LPL statements they complain of. So all of that is circumstantial evidence of how Premier and Associates are closely related and because we know that Premier is Ms. Cure's DBA, we can also make that connection. But to be clear, LPL's position is not that Premier and Associates should be compelled to arbitration solely because they're related entities. While that is a factor under California law, what's key is that their claims in this case are intertwined with the representative agreement itself. Well, maybe, maybe not. I mean, I thought one of the allegations by the entities was that what LPL did after the termination and separation injured their business. There was interference with contracts or interference with prospective business. Those kinds of things would be separate and independent from anything having to do with Mrs. Cure's affiliation and disaffiliation with LPL. Well, what's key is what all three plaintiffs, Ms. Cure, Premier, and Associates complain about is public statements that LPL made and those statements only reference Ms. Cure. Well, but they were made after she was terminated or disaffiliated. In other words, they were independent of anything they had to say to the, I guess FINRA, that they had to represent. I mean, they were independent of any kind of issue in terms of terminating her. Well, our contention is that they're tied up with the termination and it's not solely that they were claims, that they were statements made following the termination. It's what the statements say. So the statements say that Ms. Cure was terminated for violating the code of conduct, which was incorporated into a representative agreement. And so tied up within that claim is a fundamental truth question of did LPL terminate her for violating the code of conduct? And to answer that question, you have to look at the code of conduct and then you have to look at the representative agreement, which has the arbitration agreement. And that is how the claims are intertwined and that's how the district court erred in failing to consider that fact. In other words, what you're saying is that in the actions brought by Premier and associates, they will also have to determine the truth or falsity of that statement. Yes. And that's a more clear link, obviously, with the defamation and the business disparagement claims. But one of LPL's defenses to the tortious interference claims is that it was justified in making those statements that give rise to it. And so again, we look at what the actual statements say and that shows how they're intertwined with the contract. And it's also important to note for associates that the only claim that they bring is a defamation claim. Associates does not have a tortious interference claim. It is solely a claim of defamation based on the statement that Ms. Cure has been terminated from LPL for violating the code of conduct. Is it true, as it would be with a defamation claim generally, that truth is the ultimate defense, as they say? Yes. Because it's an entity, that doesn't change? Yes, that's correct, Your Honor. So the only document you're specifically identifying is the code of conduct? So the representative agreement incorporates the code of conduct. It provides that it applies to, and this is another key point, this applies to Ms. Cure and her affairs. And it says that she will comport herself in a professional manner to further LPL's business. So this is all tied together. And because it includes her affairs, our contention is it will apply to her business entities. And to be clear, we're not asking the court to decide that what she does on a Saturday morning at the grocery store is her affairs covered by necessarily. Didn't she have to get approval to set up Premier or acquiescence or something? Yes. She had to get approval and complete what's known as an outside business activity form for both Premier and Associates. And she did that. And on those forms, she disclosed that Premier would be her LPL, DBA, and that Associates was an accounting firm. That's why I asked about Associates earlier and its existence pre-LPL, affiliating with Cure and vice versa. I mean, is there a distinction there? Because Premier clearly says DBA, LPL, and that was her business vehicle, right? But doesn't Associates have a separate life, and does that matter in terms of its attenuated connection to the arbitration agreement? So I would agree that they're different facts and that a DBA is different than a business one owns. And of course, we understand that they're distinct business entities, and the law recognizes that. However— How could it be that we reached divergent decisions, Premier, vice, Associates, because of the more attenuated connection with Associates? The court certainly could, but there's enough evidence here that Associates is closely related enough in this particular case and based on these particular allegations that because Associates' defamation claim is intertwined with the representative agreement, and there's no way that the court will be able to address the merits of that without dealing with the arbitration—without dealing with the representative agreement, that it should be compelled to arbitration. So they're separate bases, but both should be compelled to arbitration. So turning to my second point, the district court erred in denying LPL's motion to stay litigation pending arbitration. To be clear, Premier and Associates waived this issue by failing to adequately brief it in the response brief. But in any event, this court has held that a stay involving non-signatories is subject to the district court's discretion where three things are true. First, the same operative facts are involved. Second, the claims are inherently inseparable. And third, litigation has a critical impact on arbitration. And what matters is protecting the signatory's rights to arbitration, not any harm that would result to the non-signatory. And I would couple that with federal law's deference to arbitration. So going to these three elements, first, the similarity of operative facts. As we've discussed, the claims ordered to arbitration already, Ms. Kure's claim for tortious interference and defamation, all arise out of LPL's public statement that Ms. Kure was terminated for violating the codes of conduct. Premier and Associates' defamation claims also arise out of the very same LPL statements. And I would point the court to pages 280 to 282 of the record, and they're also in our briefing where the statements are reprinted. So the operative facts are all going to be the same here. Claims are also inherently inseparable, and the court has held that what matters is the violated right, not the remedy or what the cause of action is called. And at base, all of plaintiff's allegations are essentially getting at whether they have some legal remedy against LPL for LPL's public statements. Whatever we call the claims, that's the issue at the end of the day, and they're inherently inseparable. Finally, we know that litigation will have a critical impact on arbitration and a risk of inconsistent results. For instance, the arbitrator could find that, could find for LPL on Ms. Kure's claims and could find that that statement, those public statements were not defamation. But then a federal jury could find somehow or the judge could find that those statements were defamatory or tortious interference as to Premier and Associates, which would be an inconsistent result. Also, if litigation is resolved before arbitration, we could see that the arbitrator would be influenced to follow the federal court. Are both, on both of these issues, are the standard of review abuse of discretion? So the standard of review in this circuit for a motion to compel arbitration, the general rule is de novo. However, this court has said in equitable estoppel cases that it's an abuse of discretion standard. As to the stay, it is an abuse of discretion standard. However, here, our contention is that the district court abused its discretion in both manners. First, as to equitable estoppel, failing to consider that the claims and the defenses are tied up in the representative agreement itself. And then as to the stay, by failing to recognize that the operative facts are the same, the claims are inseparable, and the significant impact on litigation. In sum, LPL respectfully requests this court reverse the district court's denial of LPL's motion to compel arbitration as Premier and Associates, to stay all litigation pending arbitration, and finally, to maintain this court's stay of district court proceedings pending the outcome of the appeal. If there are no further questions, I will reserve the rest of my time for rebuttal. Thank you. Thanks very much. Ms. Clevenger. Good morning, Justice Clement, Judge Clement, Judge Jones, and Judge Wilson. May it please the court. Again, the court did mention the standard of review, and I do think that's obviously the framework that's important here, because we are looking for either an erroneous application of law or an erroneous assessment of the evidence. Neither of . . . Did you concede on the second issue as far as stay pending arbitration in the district court? I mean, you didn't address that in your briefing. So, did you concede that issue to the other side? Yes. Yes, Your Honor. So, there should be a stay pending arbitration? We do not contest that, Your Honor. Okay. I think there's a basis to contest it, but it's not, you know . . . Well, if you haven't, you haven't. I mean, that's why I asked the question. No, Your Honor, it's . . . So, we're here to talk about whether the entity's claim should be compelled to arbitration. We are electing not to contest the stay request, so I believe that goes to points two and three of the relief that's requested by the appellant, if I'm not mistaken. Okay. You want to affirm across the board? Yes, Your Honor. So, of course, a basic precept underlying the Federal Arbitration Act is that arbitration is a matter of consent, not coercion. And we've obviously got two entities here, both of which are owned and managed by Miss Eileen Kier, who's the plaintiff and the appellee herein. And we have two scenarios in which arbitration can be compelled. Obviously, one is where the party's consented, and there is a valid arbitration agreement between Miss Kier and LPL Financial. The second is by equitable estoppel, which is governed by contract principles and fundamental fairness. The appellant has stated that the defamation claim raised by Kier and Associates and by Premier requires reference to the contract to determine liability. That is not the case. The appellant has represented that the sole basis for the defamation claims are the statement by LPL Financial that Miss Kier was terminated for violation of the Code of Conduct. That's not actually true. However, even reference to the representative agreement itself, there's a general statement with respect to Miss Kier's conduct, but the contract itself doesn't contain the Code of Conduct. So, insofar as there's a definition sought in the defamation claim as to—in order for LPL Financial to defend on the basis of truth, that's a definition that could perhaps be sought from the Code of Conduct, but there is no—one of the problems in this case is that there is no Code of Conduct contained in the representative agreement, and the Code of Conduct provided by LPL Financial during the litigation was not actually ever provided to Miss Kier. So, that's the issue. Doesn't the agreement reference the Code of Conduct or LPL's Code of Conduct or standards? It does. Yes, Your Honor, it does. And you're saying that's just not enough? That is not enough. It has a general representation with respect to Miss Kier conducting herself in a professional manner in all of her affairs, which I'm sure the Court will agree doesn't—and the appellant has conceded—doesn't govern everything that Miss Kier does. And it certainly doesn't govern legal conduct engaged in by Miss Kier in the context of another business which had been in existence since 1989 and is fundamentally unrelated in terms of the business that's conducted there. So— But that's not true as to Premier, is it? It is somewhat true of Premier in that Premier was formed as an entity to handle the clients that were doing business or—let me back up, Your Honor, because to answer that question, I didn't understand the financial industry, and I'm not claiming to now at the time that I first began speaking with Miss Kier. But it's my understanding that Miss Kier has been a registered broker with FINRA since June 6th of 1992. In order to actually engage in the practice that that license engages her to do or authorizes her to do, a broker-dealer, an independent broker-dealer has to hold her license. And so through various points through her career since 1992, various broker-dealers have held her license, LPL being the latest. But as is in the record, Miss Kier brought a $40 million book of business with her to LPL, so those clients— But she created LPL, didn't she? I'm sorry, Your Honor? I thought she—I'm sorry, she didn't create LPL. I thought she created Premier. She did create Premier, and that is a good point. And that was only because she had this book of business with LPL to service. Well, she had the—to clarify, she had the book of business well before she— I understand that. But she used Premier as the agent or whatever you want to say. She created that in order to carry out her LPL business. That is correct, Your Honor. Okay. That is correct. And it didn't do anything else. I mean, it doesn't do anything else. That is correct. And Premier, it's unquestionable based on the record, and the APLE doesn't contend that Premier does not or did not rather obtain benefits from the contract. But under the theory of direct benefits estoppel or intertwined claims, that's not enough. It's not enough that Premier—and the district court recognized that, and that was a correct statement of the evidence before the court. So Premier got direct benefits from the contract. That would be enough if the direct benefits are extensive enough, correct? I'm not sure, Your Honor, because the case law seems to reflect that the parties to whom direct benefit equitable estoppel was applied were actually seeking out direct—a direct benefit— But if Premier's whole reason of existence was to allow Ms. Keurer to do the work that she and LPL had contracted to do, I mean, all of Premier's revenue would have come from LPL's agreement with her, right? In a sense, but really the revenue would have come from preexisting contracts brought into Premier by Ms. Keurer that were then administered with LPL pursuant to the representative agreement. Yes, that's correct. But, I mean, her continuing work to representing that book of business, representing those with LPL, was basically her broker-dealer, correct? The continuing business during—yes. And Premier didn't exist with the book of business pre-LPL. Premier was founded or formed by Ms. Keurer to facilitate her work with LPL. Yes, that's correct. So how did—I mean, I guess Premier didn't seek direct benefits, perhaps affirmatively, but all the benefits Premier got came from that agreement. I would disagree, Your Honor, in the sense that benefits that Premier got were related to the contracts that existed well before its establishment. So to some extent, Your Honor is correct, but as far as the characterization of the benefits themselves, they were administered by association with LPL, but they didn't exist because of LPL. So I'm not sure if that was a non-sequitur, but I was attempting to answer Your Honor's question. I agree to a certain extent. I guess if we're in agreement to a certain extent, isn't the overall point that all of this is going to be wrapped around the axle, whether your side wins or their side wins, but it's all going to be wrapped around the axle with LPL's agreement with Keurer, correct? In a but-for sense, Your Honor, that's correct. Isn't that enough to compel arbitration of these non-signatory related entities? No, Your Honor. It's not. It is absolutely not enough. What would be then? Well, if, for example, Premier were claiming a violation of the agreement itself or attempting to avail itself of provisions of the agreement, if Premier were litigating over, for example, commissions that had not been timely paid or if they were claiming that it was early termination or wrongful termination of the contract or termination without notice was the cause of their damages, then yes, that would be enough. But in this case, Premier's claims, neither Premier's claims nor Keurer and Associates' claims are determinable based on the contract. They don't arise under the contract. But they all arise out of the separation and the termination of the contract, don't they? A common nucleus of operative facts, yes, but that's not enough to compel parties to arbitration when they have not agreed to arbitration. That's not enough to justify denying these— What are your cases that—I mean, I do realize it's not easy to compel non-signatories to arbitrate, but it just seems to me that all of this stands or falls on Ms. Keurer's testimony and her relationship with LPL. I mean, every bit of it does for Premier and Associates. Your Honor, that's a tricky argument, and I anticipated that would be a question that the Court had. But, again, so—and I guess what I kept coming back to when I was reading last night about this case is that the reason that Ms. Keurer was compelled to arbitration is because, as the Court's aware, there were two arbitration clauses, one of which doesn't really apply in this context, but the relevant arbitration clause would be contained in—I think it's on page 7 of the Representative Agreement, and the District Court cited it, cited that clause in its opinion, which is at tab 3. And it's a general clause, and so the Court was pretty clear that this clause says, any and all claims, disputes, or controversies relating to representatives' association with or termination from LPL, well, obviously, the claims brought by Ms. Keurer are related to or, you know, related to her association with LPL. So it's a pretty broad clause. So that's the reason why her claims are brought in, even though we, of course, argued at the District Court level that they're not contained within the scope of the arbitration agreement because they arise under state tort law. But with respect to Premier and particularly with respect to Keurin Associates, that connection becomes very attenuated because, again, they're state law claims, and you don't have a signatory, so they're not subject to this sort of general, all-encompassing clause. So you've got a bit of attenuation with respect even to Ms. Keurer in the sense that they aren't, you know, necessarily related to the terms of her contract, but the attenuation becomes even greater with respect to Premier and then even greater with respect to Keurin Associates. Well, suppose the arbitration — suppose the arbitrator rejects her defamation claim and says there was no defamation, which would imply that whatever LPL said about her was true or justifiable. Doesn't that immediately ruin the claims of Premier and Associates? I am not sure what the answer to that is, Your Honor, and I was attempting to figure that out with respect to whether a determination made in an arbitration has any effect on — Yeah, well, I mean, at the very least, I suppose the jury would be allowed to hear that outcome, whether they be bound by it or not, but assuming that arbitration went forward first, it seems to me it would be very hard to persuade a jury that their business — the business of these subsidiaries or whatever you want to call them, related entities, was ruined when LPL had a right to do what it did, or you would have just put an LPL person on the stand. And that may indeed be the case, Your Honor, but that then becomes an issue of efficiency in the proceedings, and that's not something that justifies compelling parties to waive their jury trial rights when they have not so specifically agreed. So, do I understand your position to be that the claims are not so intertwined or springing from such overlapping facts that arbitration can be compelled of these non-signatories, but you're not contesting that a stay could be entered in the district court, staying everything until Ms. Kure's arbitration is finished? We are opting not to contest that at this time before this court, Your Honor, with respect to the stay that this court has imposed on the district court's proceedings. I'm talking about a stay of proceedings in the district court. Say we don't compel Premier and associates to arbitration. Are you contesting whether the litigation should be stayed pending Ms. Kure's arbitration? Yes, Your Honor. With respect to that issue, we would contend that the district court should not need to stay proceedings pending the arbitration. Okay. I just asked that earlier, and I'm trying to clarify confusion because there's nothing in your brief. I misunderstood Your Honor's question. We're unclear. Yeah, because she wanted affirmance across the board. Well, I mean, I heard that too, but there was just no argument. You're not making any argument about that issue? No, Your Honor. But you don't have to because you're the appellee. And again, it seems to me that many of the court's questions have gone to the common nucleus of operative fact. I acknowledge that that's an issue, but that's not an issue that was created by these appellees. The appellant here could have opted to litigate all claims in district court, and it would have probably been more convenient for all of the parties, but that's not the case. That's not what has happened, and that is not sufficient to rise to the level of an abuse of discretion on the part of the district court. If the court has no further questions, I'll move. Thank you. Thank you. All right. May it please the Court, I'd first like to start with the issue of what is still left before the Court. We've heard from the first time today that the appellee is not contesting that this Court should maintain the stay of district court proceedings pending the outcome of the appeal. There was some uncertainty as to whether a stay of litigation pending arbitration was conceded, whether or not it was. As we argued in our brief, it was not adequately addressed in their briefing, so the issue is waived. But they're appellees. They don't have to brief everything, do they? They still have to respond to our briefing, Judge Jones, and our contention is they did not adequately brief that, so they've waived it. Next turning to the representative agreement, I'd like to note a few things for the Court with some record citations. So first, the representative agreement can be found at pages 334 through 336. The key portions are there. Section 4C of the representative agreement at page 336 and also 334 in the Recorded Appeal has a handful of key things that CURE agreed to. First, to, and I'm quoting from the representative agreement, to, quote, conduct herself and her affairs in a professional manner consistent with the building of a quality reputation for herself in LPL, to, quote, conform to the established customs, standards, and policies and procedures of the securities industry in LPL, and to supervision and control by LPL to enforce FINRA and SEC rules, and the second one at page 336, referencing the standard and policies, is how the code of conduct is incorporated into the representative agreement. As the Court noted earlier, everything is indeed wrapped around the representative agreement and LPL's relationship with Ms. CURE, and again, the representative agreement refers to Ms. CURE and her affairs and requests and holds her to a standard of professional conduct to maintain their reputation. So certainly her DBA, Premier, and then Associates, who has similar employees, has the same office, shares mutual clients, she's bound to that obligation. Next I'd like to turn to specific facts as to Premier. First, as the Court noted, that's a DBA for Ms. CURE's LPL business. As Judge Wilson said, it's the whole existence of that business. We can look to pages 246 and 410 of the Record to see when that was formed. We know that the certificate of formation was filed the same day as CURE signed the representative agreement. We know that she disclosed it to LPL for the sole purpose of, let's see, operational or marketing name for her LPL business and the DBA. We also hear that Premier Apley's admit to receiving a direct benefit from the representative agreement that is the whole essence of Ms. CURE's relationship with LPL. And to be clear, LPL would have never entered into an affiliation with Ms. CURE had she not signed the representative agreement. There's also no evidence in this record of any revenue for Premier separate from LPL. As to Associates, as we discussed earlier, the sole claim is defamation. The statements were made only as to Ms. CURE, and several quotes from those, first a, quote, violation of our policies, quote, a reference to the, quote, standard of conduct, and, quote, CURE no longer is a client of LPL. So all of those are direct statements to Ms. CURE, and the fact finder will necessarily need to review her termination in the context of the representative agreement and whether or not those are truthful statements. Finally, Judge Jones referenced a risk of inconsistent results, and while that is not a direct prong of an intertwined estoppel claim, it also does show exactly how intertwined the claims are. So I think that can't be ignored. So if there are no further questions, we request this court reverse the district court's order to the extent that it denied the motion to compel Premier and Associates' claims to arbitration unless there be any doubt to stay litigation pending arbitration. Thank you. All right. Thank you. We have no more cases this week. The court will stand in recess.